NASHVILLE, C. & ST. L. RY. *v.* BARNES *et al.*,

(*Jackson*, April Term, 1941.)

Opinion filed May 24, 1941.

W. P. Moss, of Jackson, for plaintiff in error.

THOMAS McCORRY and DAVID P. MURRAY, both of Jackson, for defendants in error.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

The Railway appealed from judgments for damages in three cases tried together in favor of Barnes, the driver of a car which collided with a freight train, and his two guests. The charge was common law negligence in failing to give proper warnings or signals. The Court of Appeals found that the uncontroverted testimony showed that the plaintiffs were guilty of negligence which proximately caused the accidental collision, and, holding that the trial Judge should have directed verdicts for the defendant, reversed and dismissed the actions. This

Court granted *certiorari* to review this issue and argument has been heard.

The specific conduct of plaintiffs which the Court held constituted negligence was their failure to exercise ordinary care in listening for a moving train as they approached the track, under unusually dangerous conditions which particularly called for listening as an exercise of ordinary care. The driver of the car was Mr. Barnes, an old railroad man, at this time engaged in farming. A Mrs. Petty, since married to Mr. Barnes, and a Miss Stanfill were riding in the car with him and all three were on the front seat. They had had dinner together and had been "riding around," and at this time were starting to take Miss Stanfill to her home in Henderson. The occupants were slightly injured, the chief damage being to the car, which was a new Buick and badly wrecked.

The accident occurred about midnight at a street crossing in Jackson, opposite the depot of the Railway. Plaintiffs testified that the location was thoroughly familiar to them all, they having constantly used this street and crossing for years. Plaintiffs and their witnesses say that it was a very dark, rainy night and that there was a heavy fog. They say that as they approached the crossing the driver slowed down the speed of the car to about six or eight miles. One occupant of the car says eight or ten miles, and estimates the speed of the train at about the same rate. The car was not stopped, however. They say they looked ahead as best they could through the darkness, rain and fog and saw no train on the tracks and no signal lights. The ladies say they were engaged in casual conversation and uttered no warning to the driver, and agree that all the windows of the car were closed.

They collided with a freight car which was being slowly pushed at the end of a train of cars by a locomotive at the other end, some 300 feet away. The backing freight train approached the crossing from the north, the left side of the driver of the automobile, who was proceeding East. The automobile, being on the south side of the street, the freight car crossed the street and collided with the automobile. Plaintiffs say they were looking and saw no signal lights on the train and did not see the freight car as they moved across the street. Defendant's proof was that a brakeman was standing on top of the freight car, about ten feet from the rear end, with a lighted electric lantern; that when he saw the headlights of the approaching car he shouted warnings and waved his lantern as a signal to the engineer to apply his brakes. A second employee was on the running board of the tank car next to the end car, also carrying a lantern, and who says he also signalled with his lantern and shouted warnings. That they did shout warnings is established by other nearby witnesses than themselves, not railway employees, one of whom heard the shouts of the brakemen and was roused from sleep by them, while in bed in a room of a hotel some ninety feet away, but he had a window open, which looked out in the direction of the crossing. He put on a bath robe and came at once to the scene. The engineer and fireman say that the bell was ringing. However, plaintiffs say that they did not see the waving lantern and did not hear the shouts of the brakeman, or the ringing of the bell, or the sounds ordinarily incident to the moving of a train of freight cars.

It is true, as found by the Court of Appeals and insisted by the Railway, that none of the occupants of the car in terms state that they were listening as they approached the tracks. However, they do say they were

looking, and it is plausibly argued that when one testifies that he was looking as he approached a track crossing, the inference is fair, and implication reasonable, that he was also using his ears. We think this argument sound ordinarily and under many circumstances it should be accepted.

However, as before indicated, we have here peculiar facts and conditions which would seem to rebut the presumption usually arising from testimony that plaintiffs were looking for a train, that they were also listening for its approach. Here were atmospheric and physical conditions which to a large extent eliminated sight as a factor of precaution and devolved the obligation of ordinary care upon the faculty of hearing. Since plaintiffs could not see with any degree of clarity or sureness, the obligation to exercise to the fullest extent the precautionary factor of hearing became imperative. The tracks cross South Royal Street at right angles. Defendant's passenger station is 18½ feet from the sidewalk. This and other buildings obstruct the view of persons on Royal Street approaching the tracks as were plaintiffs. Their vision was, therefore, affected, if not destroyed, by (1) the bad atmospheric conditions we have described, and (2) these building obstructions. We here quote from the opinion of the Court of Appeals:

"The law imposed upon the plaintiffs the positive duty of looking and listening for the approach of the train before going upon the tracks; and the fact that their visibility was greatly impaired, if not entirely destroyed, by the darkness and mist, imposed upon them the duty to listen the more intently for the approach of a train. In other words, the duty to listen for the approach of a train became proportionately greater as visibility was impaired.

"In *Railroad* [*Co.*] v. *Satterwhite,* 112 Tenn., 185, 204, 79 S. W., 106, the court approved the following statement of the law on this question as laid down in *Phillips* v. *Detroit* [*G. H. & M.*] *Ry. Co.,* 111 Mich., 274, 69 N. W., 496, 66 Am. St. Rep., 392:

" 'The plaintiff, if he could not see an approaching train, by reason of obstructions, was bound to use greater precautions in nearing the track. A person about to cross a railroad track is bound to recognize the danger, and to make use of the sense of hearing as well as of sight, and, if either sense cannot be rendered available, the obligation to use the other is stronger, to ascertain before attempting to cross whether the train is in dangerous proximity.'

"This language was approved in the later cases of *Todd* v. [*Cincinnati, N. O. & T. P.*] *Railroad* [*Co.*], 135 Tenn., 92, at page 101, 185 S. W., 62, L. R. A., 1916E, 555, and in [*Nashville, C. & St. L.*] *Railroad* [*Co.*] v. *Parks,* 136 Tenn., 367, at page 373, 189 S. W., 695.

"The plaintiffs did not take this precaution for their own safety; they admitted that they had the automobile windows closed, and while it was true that they were familiar with the crossing and slowed down the speed of their car to six miles per hour, and looked for a train, and approached the crossing cautiously, they do not positively say that they listened for the approach of a train, but merely said that they did not hear any whistle or bell, or any other warning of an approaching train.

"The case of *Louisiana & Arkansas Railway Co.* v. *Jackson* [5 Cir.], 95 F. (2d), 369, is similar in its material facts to the case before us. In that case the accident happened at 5:55 o'clock on a dark, foggy, rainy morning in February. The plaintiffs admitted that because it was rainy and cold, they had the car windows closed as they

approached the crossing, and testified that they did not see the train until they were on the track and the engine was practically upon them. The court held that it was 'perfectedly plain' that as to the driver the defendant should have had an instructed verdict; and that the guest was likewise guilty of contributory negligence as a matter of law in failing to warn the driver of the danger, saying: 'Had he insisted on the driver taking the proper precaution by stopping, or at least letting down the windows so that the approaching train could be seen or heard, the injury would not have occurred.' "

██ It is not necessary to construe the failure to testify that the parties in this car were listening as evidence that they were not listening, although it must be conceded that their failure to so testify directly suggests that they did not give listening the place of importance which the conditions called for, but they agree in testimony rebutting the exercise of this positive requirement of prudence. They say that they had and kept the windows of the car closed. It is common knowledge that this shuts out, cuts off, sounds from the outside. With the motor running and conversation going on within, sounds from without are minimized, if not nullified. Certainly, it cannot be reasonably contended that one within a car so closed up is exercising a reasonable effort to hear sounds from without. And every day practice is to close the windows when it is desired to cut off outside noises from a room. Nothing is more common. It is a matter of common experience to every driver of a car that under fog conditions both sight and hearing are greatly facilitated by opening the glass windows.

Now the occupants of this car all knew they were approaching, about to cross, railroad tracks, always an

admonition of danger; they knew that sight was largely destroyed by darkness and rain and fog. They did not stop the car and cut off the motor and open the windows to afford both sight and sound. Is not this why they did not hear the warning shouts which roused the witness in a building ninety feet away, who had his window open? And perhaps why they did not hear the ringing of the bell?

We have said they did not stop the car before proceeding over the tracks ahead. Now this was not a railroad crossing to which the statute applies which requires that a driver of an automobile shall come to a full stop before crossing. Code 1932, section 2683. That statute applies under two conditions only (1) when a signal warns of the approach of a train, and (2) when the crossing has been designated by the Highway Department as "a particularly dangerous crossing." But, an analogy is suggested. It may well be held, as a matter of common law obligation, that when a crossing is "particularly dangerous" because of conditions obvious to the driver, he should stop in order effectively to look and listen before proceeding on the tracks, this in the exercise of ordinary care. We do not, however, rest our decision on the failure of the plaintiffs here to come to a full stop, but we are unable to escape the conclusion that the plaintiffs, on their own testimony, did not exercise ordinary care in the performance of the positive duty resting on them to listen for an approaching train. They had deprived themselves of the opportunity to listen effectively, as much so as if they had stopped their ears with cotton. They were, therefore, guilty of contributory negligence, and the Court of Appeals, looking alone to the undisputed facts as testified by plaintiffs, rightly sustained the motions for directed verdicts and dismissed the suit.

In so holding, we have conceded the negligence of the Railway, although it is plausibly insisted that the proof is positive that signals and warnings were given, and that the contradiction relied on is of a negative character altogether. The judgment of the Court of Appeals is affirmed.